# Cincinnati Butchers Supply Co. v. Kentucky Packers, Inc.

Jan. 14, 1941.

Harry H. Ramey for appellant.

Fred Meade and Howes & Walker for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

The Cincinnati Butchers Supply Company brought this action against the Kentucky Packers Company in January, 1939. The petition alleged that the Packers Company was indebted to the Supply Company in the sum of $304.06 for certain machinery and electrical equipment sold to it between December 24, 1937, and February 18, 1938. The Packers Company filed an answer and counterclaim in which it denied owing the amount sued for. It set up in its counterclaim that on November 23, 1937, it purchased from the Supply Company certain machinery and equipment for the purpose of starting a packing plant. The principal basis of its counterclaim was that certain items of the equipment were defective and not suitable for the use intended. It sought damages in the amount of $2,500. A demurrer was filed to the answer and counterclaim. Further pleadings were filed, including a reply, an amended answer, counterclaim and set-off and a reply to the latter pleading. Practically all of the testimony was directed to the issues raised by the counterclaim and set-off. The Supply Company filed a motion for a directed verdict when the Packers Company concluded its evidence, and also at the conclusion of all the evidence. The jury

found for the Packers Company in the sum of $1,287.62. This appeal is being prosecuted from the judgment on that verdict.

The Supply Company is still insisting that it was entitled to recover the amount claimed in its petition, $304.06, since there was no claim that the machinery and equipment constituting its action were defective. We think this position is well taken, but it does not follow that the counterclaim and set-off should have been dismissed. The Supply Company is a non-resident; therefore, the counterclaim—in fact a set-off and so labeled in the amended answer, counterclaim and set-off—could be pleaded and relied upon by the Packers Company. Subsection 2 of Section 96 of the Civil Code of Practice. Cross v. Snyder's Adm'x, 164 Ky. 370, 175 S. W. 641; Patterson v. Woolridge, 170 Ky. 748, 186 S. W. 639; Simons v. Douglas' Ex'r, 189 Ky. 644, 225 S. W. 721; Kortz v. Union Central Life Ins. Co., 264 Ky. 750, 95 S. W. (2d) 611.

The amended answer, counterclaim and set-off contained the following allegations:

"It was part of said agreement that said electrical machinery and equipment were to be free from defects when installed and were to be sufficient for the operation and maintenance of defendant's said plant in processing cattle, hogs and other livestock into marketable meats, sausages, fats and other allied products; but defendant now alleges that, as more particularly set out in its original answer and counterclaim, said machinery and equipment were defective when installed and were wholly insufficient and inadequate for said purposes, or either of them; that both plaintiff and defendant made repeated attempts to remedy the said defects, but in each and every instance failed to do so; that said plaintiff made and repeated its promises to remedy said defects after the installation thereof and after the matter had been repeatedly called to plaintiff's attention, and continued to make said promises of repair and to remedy said defects, during all of which time the said defendant was thereby lulled into a sense of security and made to believe that said plaintiff would carry its said promises, and during which time said defendant continued to

pay for said machinery and equipment, and had it not been for said promises said defendant would not have made said payments.

"Defendant further states that the defects herein mentioned and more particularly set out in its original answer and counterclaim and so wrongfully and fraudulently concealed by the plaintiff as that no reasonable inspection or examination thereof disclosed the same or could have disclosed the same."

In its reply to this amended pleading the Supply Company, after denying the allegations therein, set up the contract under which the equipment was purchased in November, 1937.

The contract shows that all of the equipment was either used or reconditioned with the possible exception of a beef tree. The following provisions in the contract are relied upon by the Supply Company:

"The Seller guarantees the material mentioned herein against defects for a period of ninety days from date of shipment. Parts claimed defective must be returned prepaid by the Purchaser, to point of manufacture for inspection by the Seller and will be replaced free of charge F. O. B. point of manufacture if found defective as claimed. No allowances, deductions or charges will be permitted on account of any defective material.

"The foregoing is the agreement as it exists at this date, and it is agreed and distinctly understood that all previous communications between the two parties hereto, either verbal or written, contrary to the provisions hereof, are hereby withdrawn and annulled and that no modification of this agreement shall be binding upon either party unless such modifications shall be in writing, duly accepted by the Purchaser and approved by an officer of the Seller at its home office."

The Packers Company insists that there was an implied warranty in addition to the express warranty in the contract by virtue of item (1) of Section 2651b-15 of the Statutes. That part of the statute reads:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose

for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.''

The case of J. B. Colt Co. v. Asher, 239 Ky. 235, 39 S. W. (2d) 263, is cited in support of this contention. Be this as it may, the evidence was directed in the main to defects in the equipment and not as to whether the equipment was reasonably suited for the purpose for which it was sold, namely, the processing of meat in a packing house. While there is some contention that certain of the items of equipment were not delivered as soon as they should have been, we think this controversy hinges around events which happened after the delivery of the equipment to and its installation by the Packers Company.

The contract guaranteed the equipment against defects for a period of 90 days, and also that parts claimed to be defective were to be returned to the Supply Company for its inspection. Defective equipment was to be replaced by the seller. It was the duty of the Packers Company to return any and all equipment found to be defective to the Supply Company upon the discovery of the defects if it desired to rely upon the 90-day guaranty. The proof shows conclusively that this was not done. The testimony of the secretary and treasurer of the Packers Company is in part as follows:

''* * * From the moment that equipment was installed it became perfectly obvious that the starting box was obsolete and unfit for use. And when we attempted to work it there was a short in the motor that was so strong that it penetrated the entire section of machinery, making it entirely impossible for the sausage man to work with this machinery—he could not stand there and attempt to mix the meat because the shock was so terrific, and he refused to do it. We attempted then to repair the thing with rapidity and we called in the available electric people in the vicinity to attempt to get the motor fixed in order to bring around this business because we had already sold the merchandise and advised the people that we would be delivering same. It was necessary that we get it back with as much rapidity as possible and we did not have ade-

quate time to do the motor over again. We had to stop while we were attempting to fix this motor. This was done, the motor was connected and started and after a few hours the old condition arose and we were again forced to shut down. And so through this period in the inception of the business we had such terrible amount of trouble with the machinery and people inquiring and could not find the reason of the shutdown. We then advised the Cincinnati Butchers Supply Company of this trouble and they finally had a mechanic to come and look it over and he found it impossible to do anything with it and he returned to Cincinnati and sent another motor which we hired people to hook up. * * *''

Had the Supply Company stood on its contract and required that the Packers Company send to it the equipment thought to be defective, the situation before us would be materially different. Instead, the Supply Company, on at least two occasions, sent its agents to Paintsville to see about the equipment. One of the agents attempted to do some work on a part of it and another was there when a second motor, smaller than the first one, was installed. In this connection, it appears that the Packers Company kept both of the motors.

The contract provided that any modifications must be in writing, but we think the proof shows conclusively that the parties subsequently entered into an oral agreement as to the manner in which defects were to be corrected. If the Packers Company had notified the Supply Company upon the discovery of the alleged defects at the time the equipment was installed, and if the Supply Company had agreed to send one of its agents to the plant of the Packers Company to examine the equipment and correct the defect, the situation again would be different. This would have constituted a waiver of the provision of the contract as to the sending of any equipment thought to be defective to the Supply Company, and the Supply Company's liability, assuming the contract was breached, would have attached at that time. It can be seen, therefore, that up until the time the Supply Company agreed to send its agents to the plant of the Packers Company after notice of the alleged defects, there could be no claim against it for a breach of the contract.

The court should have instructed the jury that, in the event it believed that the parties entered into a subsequent oral agreement as to the manner in which defects in the equipment were to be corrected within the 90-day period, and that that agreement was breached, they should find for the Packers Company for such damages as it sustained as a result of the breach. It follows also that the proof as to damages on the Packers Company's set-off should have been confined to such damages as it sustained as a result of the breach, if any, of the subsequent oral agreement. Any finding in favor of the Packers Company on its set-off in excess of $304.06 should have been credited with that amount, since, as we have indicated, this record shows conclusively that the Supply Company was entitled to a judgment for the amount claimed in its petition. If a smaller amount had been found for the Packers Company, then that amount should have been deducted from the $304.06 and the balance found in favor of the Supply Company.

Wherefore, the judgment is reversed with directions to set it aside and for proceedings consistent with this opinion.